In re William C. SOUTHARD, Debtor.

William C. Southard, Plaintiff,

v.

Educational Credit Management Corporation, Defendants.

Bankruptcy No. 3:04 BK 12891. Adversary No. 05–118.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Jan. 31, 2006.

J. Dinkins G. Grange, J. Garfield Hurt and Assoc., Jacksonville, FL, for Debtor.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This Proceeding is before the Court upon the Complaint filed by Plaintiff, William C. Southard, seeking a discharge of his educational loans pursuant to 11 U.S.C. § 523(a)(8). A trial was held on November 3, 2005. Based upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Plaintiff, William C. Southard, filed a voluntary petition under Chapter 7 of the Bankruptcy Code on December 23, 2004. The Court entered a discharge on April 8, 2005.

2. On April 14, 2005, Plaintiff filed the instant adversary proceeding seeking to discharge his student loan debt, which is currently held by Defendant, Educational Credit Management Corporation ("ECMC").

3. Plaintiff is married and has no children. [Tr. at 86].[1]

4. From 1987 to 1993, Plaintiff attended Rocky Mountain College in order to become a commercial airline pilot. [Tr. at 10; Joint Stipulation of Undisputed Facts[2] at ¶ 1]. However, Plaintiff withdrew from Rocky Mountain College in 1993, prior to obtaining a degree. [Tr. at 12, 67, 69]. Plaintiff testified at the trial that he dropped out because he learned that a vision condition would prohibit him from obtaining the required medical certificate to qualify as a commercial pilot. [Tr. at 12] However, in Plaintiff's responses to ECMC's Interrogatories, he testified that he dropped out of college because he "ran out of educational funding." [Def.'s Ex. 2 at p. 17]

5. Plaintiff incurred the educational loans at issue to finance his education at Rocky Mountain College. [Stip. at ¶ 1, 3; Tr. at 9; Def.'s Ex. 1]

6. As of October 26, 2005, the amount owed to ECMC under the Note was $92,952.57, and interest continues to accrue on the Note at the per diem rate of $11.67. [Stip. at ¶ 4] When Plaintiff consolidated his student loans into the existing consolidated loan, his student loan debt was $46,050.18. [Tr. at 71; Stip. at ¶ 1]. However, because of Plaintiff's failure to make payments on his student loan, interest has caused the loan balance to increase substantially. [Tr. at 71–72]

7. From 2001 to 2004, Debtor made no payments on the student loan. [Tr. at 72]. The predecessor to ECMC, the Montana Guaranteed Student Loan Program ("MGSLP"), began garnishing the Plaintiff's wages in October, 2004. [Tr. at 72] Two months later Plaintiff filed his petition in bankruptcy. [Tr. at 72]. Plaintiff did not investigate other repayment options prior to filing for bankruptcy.

8. Since withdrawing from college in 1993, Plaintiff has been employed in a variety of jobs. These jobs range from Plaintiff working as a waiter to a computer consultant. [Tr. at 19–28] The wages Plaintiff earned while performing these jobs range from $4.35 per hour as a waiter to $54,000 per year as a computer consultant. [Tr. at 19–25]

9. Plaintiff is currently employed full-time as a property maintenance technician for an apartment complex in Jacksonville, Florida. [Tr. at 28] At the time of the trial, Plaintiff earned $16.12 per hour and typically works forty (40) hours per week. [Tr. at 28] On rare occasions, Plaintiff works over-time for which he is paid one and one-half of his regular hourly wage. [Tr. at 79, 80–81; Def. Ex. 4] Plaintiff also occasionally receives bonuses based upon the performance of the apartment property. [Tr. at 80]

---

**1.** "Tr." refers to the November 3, 2005 Trial Transcript.

**2.** The parties filed a Joint Stipulation of Undisputed Facts on November 2, 2005 stipulating to certain facts that neither party disputed. It shall hereinafter be cited as "Stip. at ___."

10. Plaintiff and his wife reside in an apartment in the complex where he is employed and receive a 20% discount on their monthly rent as an additional employment benefit. [Tr. at 32, 81–82] Plaintiff also receives a bonus in the form of leasing renewal incentives based upon existing tenants who renew their leases with the apartment complex. [Tr. at 82–83]

11. In 2004, Plaintiff earned a gross salary of $35,838.47. [Tr. at 84; Def. Ex. 5] With deductions for taxes and insurance premiums, Plaintiff's net salary in 2004 was $29,454, resulting in a monthly take-home pay of $2,454. [Tr. at 84] Plaintiff's wife receives Social Security disability payments of $743 per month, which she expects to receive for the foreseeable future. [Tr. at 85] Thus, the combined monthly take-home pay for Plaintiff and his wife is $3,197 per month. [Tr. at 85]

12. On Schedule J, Plaintiff listed his monthly expenses to be $2,311.26. [Def. Ex. 3] However, according to the interrogatories he filled out in August of 2005, his monthly expenses total $2,900. [Def. Ex. 2 at p. 23] Additionally, Plaintiff testified that his medical expenses were approximately $100 greater than the amount he had listed in the interrogatories. [Tr. at 88] Thus, Plaintiff's monthly expenses total approximately $3,000, which leaves him with $200 in monthly disposable income.

13. Plaintiff's monthly expenses include: $683.58 for rent, $86.22 for electricity, $30.17 for water, $330 for food, $291.58 for insurance, $59.08 per month for a home and cellular telephone, $75 per month for meals in restaurants, $75 per month for clothing, $51.74 for laundry, $81.19 for supplies for his job and $40.31 for a home office including internet access, $30 for recreation, $413.55 for automobile maintenance and $758 for medical expenses. [Def. Ex. 2 at p. 23; Tr. at 88]

14. On Schedule J, Plaintiff listed the amount he spends on car repairs and maintenance to be $130 per month. However, according to his interrogatories and testimony he now spends an average of $400 a month to maintain his automobile. Plaintiff did not proffer any evidence in support of this assertion. Further, according to Plaintiff's schedules, the automobile has a value of only $1,500. [Def. Ex. 3]

15. Plaintiff testified that his and his wife's monthly medical expenses total $758. [Tr. at 88] In 2005, Plaintiff's wife had surgery to remove a cancerous tumor and surgery for endometriosis, which are medical expenses Plaintiff hopes are not repeated in the future. [Tr. at 32, 88] Although Plaintiff's wife did not have any additional surgeries scheduled at the time of the trial, Plaintiff was not able to testify that his wife is cancer free. [Tr. at 88]

16. Plaintiff does not have any physical disability nor does he have any physical condition that would prevent him from working full-time. [Tr. at 93] Plaintiff's vision condition that he asserts prohibits him from earning a commercial pilot's license does not prevent him from obtaining other employment. [Tr. at 94–95] In addition to the surgeries Plaintiff's wife had in 2004, his wife also suffers from bipolar disorder, anxiety, fibromyalgia and chronic fatigue. [Def. Ex. 2 at p. 11] The majority of Plaintiff's wife's medical expenses are paid for by the medical insurance provided by his employer. [Def. Ex. 2 at Interrog. No. 9, Page 3 of 4; Pl.Ex. 5]

17. Plaintiff's loan qualifies for the William D. Ford Direct Loan Consolidation Program. One of the repayment programs available to the Debtor under the Ford Program is the Income Contingent Repayment Plan ("ICRP"). Under this program Plaintiff's monthly payments would range from approximately $383 to $509.

### *Conclusions of Law*

The dischargeability of an educational loan is governed by 11 U.S.C. § 523(a)(8), which provides in relevant part:

A discharge under ... this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

■ The Bankruptcy Code does not define "undue hardship." However, the Eleventh Circuit decided in the case of *Hemar Ins. Corp. of Amer. v. Cox (In re Cox)*, 338 F.3d 1238 (11th Cir.2003) to adopt the undue hardship test first set forth in *In re Brunner*, 831 F.2d 395 (2d Cir.1987) to determine the dischargeability of student loans. The *Brunner* test requires Plaintiff to prove that:

(1) he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and dependents, if forced to repay the loan;

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant period, and,

(3) he made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396; *Cox*, 338 F.3d at 1241.

■ Preponderance of the evidence is the standard of proof in student loan discharge cases. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Plaintiff bears the burden of proving all three prongs of the "undue hardship" test. *The Cadle Co. v. Webb (In re Webb)*, 132 B.R. 199 (Bankr.M.D.Fla.1991). If one of the elements of the test is not proven, the inquiry ends, and the student loan cannot be discharged. *Webb*, 132 B.R. at 202.

■ The first prong of the *Brunner* analysis requires that Plaintiff prove that he cannot maintain a minimal standard of living based on current income and expenses if forced to repay the student loans. This Court has previously held that a debtor, "must show that her financial resources will allow her to live only at a poverty level standard for the foreseeable future if she is obligated to repay the student loan." *Id.* at 202.

Poverty guidelines, published annually in the Federal Register, indicate that the 2005 poverty level for a family of two was $12,830. 70 Fed.Reg., at 8374 (Feb. 18, 2005). Plaintiff and his wife have a combined annual income of $44,700, nearly 3.5 times the poverty level.

Plaintiff testified that his and his wife's current monthly take home pay is $3,200. As Plaintiff's monthly expenses total approximately $3,000, there is $200 in disposable income that could be paid toward the student loan debt.

■ Further, to meet his burden of proof on *Brunner's* first prong, Plaintiff must show that he is living a minimal lifestyle that does not include unnecessary expenses. ECMC asserts that Plaintiff's testimony at trial established that he has unnecessary expenses. These expenses include: $75 per month for meals in restaurants, $59 per month for a cellular and home telephone, $75 for clothing, $51 for laundry including dry cleaning, $81 for work supplies and $40 for his "home office" including internet access. [Def. Ex. 2 at p. 23; Tr. at 86] The Court finds that

Plaintiff could cut down on some of the expenses listed above without causing his lifestyle to fall below a minimal standard of living. For example, it is unreasonable for Plaintiff to spend money on internet access, when he could obtain the same service for free at a public library. Also, the amount Plaintiff spends on eating out in restaurants, work supplies, dry cleaning and clothing can be reduced. These reductions should result in a minimum of an additional $150 per month. On Schedule J, Plaintiff listed the amount he spends on car repairs and maintenance to be $130 per month. However, according to his interrogatories and testimony he now spends $413 a month to maintain his automobile. Although, Plaintiff may have had to make some non-routine repairs in the preceding months, there was no evidence proffered to support his testimony that it costs him $413 a month or $4,956 a year, to maintain an automobile that he valued on his schedules to be worth only $1,500. Further, it is not reasonable for Plaintiff to assert that he plans to continue spending such large sums of money on a car that is valued at only a fraction of what he claims his repair costs to be. Thus, the amount Plaintiff spends per month on his automobile can be reduced by a minimum of $250 per month, which still allows Plaintiff to allocate $163 per month or $1,956 a year on automobile maintenance. Adjusting these expenses would provide Debtor with a minimum of an additional $400 per month, for a total disposable monthly income of $600.

This Court has previously recognized the availability of the William D. Ford Direct Loan Consolidation Program, as set forth in the Code of Federal Regulations at 34 C.F.R. § 685.100 et seq. *See Derby v. Educational Credit Mgmt. Corp. (In re Derby)* Adv. No. 03–192, Findings of Fact and Conclusions of Law dated August 23, 2004; *Stone v. Educational Credit Mgmt.*

*Corp. (In re Stone)* Adv. No. 03–1503, Findings of Fact and Conclusions of Law dated March 15, 2004.

It is this Court's finding that Plaintiff's loan qualifies for this program. [Def. Ex. 1; 34 C.F.R. § 685.220(b)(15)] One of the repayment programs available to the Debtor under the Ford Program is the Income Contingent Repayment Plan ("ICRP"). *See* 34 CFR § 685.209(a)(2) and (3). This Court previously recognized the availability of the ICRP as a factor in the *Brunner* analysis in the *Stone* case. *See Stone v. Educational Credit Mgmt. Corp. (In re Stone)* Adv. No. 03–1503, Findings of Fact and Conclusions of Law dated March 15, 2004.

The ICRP is a program under which the amount of a debtor's monthly payments on a student loan are based upon the debtor's adjusted gross income less the amount set forth in the HHS Poverty Guidelines. 34 CFR § 685.209(a)(2) and (3). Under this formula, the borrower is required to pay 20% of disposable income, which is defined as the difference between his adjusted gross income and the poverty level for his family size. 34 CFR § 685.209(a)(2). The amount of the monthly payment is recalculated on a yearly basis. 34 CFR § 685.209(a)(5). If the debtor's income is below the poverty level for his family size, then a debtor does not have any monthly payment to make. 34 CFR § 685.209(a)(6). Furthermore, the program allows a debtor to extend the student loan payments over a 25–year period. 34 CFR § 685.209(c)(4)(i). At the end of the period, if the borrower has not repaid the loan in full, the remaining loan balance is cancelled. 34 CFR § 685.209(c)(4)(iv).

The evidence presented showed that Plaintiff had a gross income of $35,838.47 in 2004. A debtor's spouse's income is also included for purposes of calculating the

monthly repayment amount under the ICRP. 34 CFR § 685.209(b). Plaintiff's wife does not have any income from employment, but does receive Social Security Disability payments. Social Security benefits may or may not be included in adjusted gross income, depending upon the income level of the taxpayer. *See* 26 U.S.C. § 86(a)(1). ECMC asserts that if Plaintiff's spouse's benefits are not included in their adjusted gross income for federal income tax purposes, the Plaintiff's monthly ICRP payment would be $383.47 per month. If Plaintiff's spouse's benefits were included, only 50% to 85% of the benefits received would be included in Plaintiff's adjusted gross income. *See* 26 U.S.C. § 86(a)(1)(A) and (B). Plaintiff's wife receives $743 per month in Social Security Disability benefits. If 50% of those benefits are taxable the resulting monthly ICRP payment would be $457.77. If 85% of Plaintiff's spouse's benefits are taxable the monthly ICRP payment would be $509.77. Accordingly, Plaintiff's monthly payments under the ICRP program would range from approximately $383 to $509 per month. Since the repayment amount is recalculated each year, should the Plaintiff's circumstances change in future years, his payment would be adjusted.

Based upon Plaintiff's own testimony, he currently has $200 per month in disposable income. Reducing some of Plaintiff's unnecessary expenses and adjusting the amount he spends on automobile maintenance would result in an additional $400, for a total disposable monthly income of $600 per month. Accordingly, the Court finds Plaintiff has the disposable income to make even the highest possible student loan payment without causing his and his wife's lifestyle to fall below a minimal standard of living.

Assuming, without deciding, that this Court found that Plaintiff met prongs two and three of the Brunner test, Plaintiff would still not be entitled to a discharge since he clearly failed to meet the first prong.[3] Thus, the Court's analysis ends with the determination that Plaintiff would still be able to maintain a minimal standard of living while repaying his student loan.

### CONCLUSION

Based upon the above, Plaintiff is not entitled under 11 U.S.C. Section 523(a)(8) to receive a discharge of his student loans. The Court will enter a separate judgment that is consistent with these Findings of Fact and Conclusions of Law.

### JUDGMENT

This Proceeding is before the Court upon the Complaint filed by Plaintiff, William C. Southard, seeking a discharge of his educational loans pursuant to 11 U.S.C. § 523(a)(8). Upon Findings of Fact and Conclusions of Law, it is ORDERED:

1. Judgment is entered in favor of Defendant.

2. Pursuant to 11 U.S.C. Section 523(a)(8) Plaintiff is not entitled to receive a discharge of his educational loans held by the Defendant.

---

**3.** As Plaintiff made no payments on his student loan from 2001 to 2004 and failed to investigate other repayment options before filing for bankruptcy a mere two months after MGSLP began garnishing his wages, it is clear there has been no good faith effort to repay the loan. Thus, although there is no need for the Court's analysis to extend beyond prong one, Plaintiff would fail to meet his burden of proof under the third prong of the *Brunner* test as well.